We'll go to Lemoge v. United States. Good morning. You've got to wait. You look over there, make sure you're, you know, you're worthy adversary is seated. Glass of water and all that, you know. Good morning. May it please the court. David Baumgarten for the appellants. Your honors, I don't think that there's any dispute that the plaintiff's counsel below, Mark Caruana, suffered from a serious and debilitating medical condition that affected his ability to manage the underlying file, which resulted in the dismissal. So I'd like to take my time this morning to focus on the issue of prejudice and how the court below analyzed that factor or that prong in the Rule 4M and the Rule 60B analysis. Let me ask you a question. The fact that the government settled the workers' comp claim, how does that prejudice the government? I don't believe it does, Your Honor, for a couple of reasons. One is the government would get the case went forward and the defendant, the plaintiff had succeeded, and then the government would have a lien on the judgment. So they get the money back anyway. Correct. The government would be entitled to an offset for whatever was paid to the work comp insurer on the separation action. And if the workers' comp carrier just held off, then the government would get an offset, as you've said. Correct. Okay. And we also know, Your Honor, that under California work comp law, that obviously the separation action by the insurer would not result in any settlement of any personal injury, pain and suffering on the damage claim. So there certainly would be no potential for double recovery against the government. Yeah. The other point that I would make on that, Your Honor, was simply that below the government didn't provide any specific basis for how it would be prejudiced. It simply asserted in its opposition papers that its, quote, approach, close quote, would have been different to the settlement conference and the Granite State action. And so I think just the absence of any specific evidence relative to prejudice that allegedly could have been suffered wasn't, in the district court's reliance on that representation, wasn't in and of itself an abuse of discretion. There simply wasn't enough evidence there to show prejudice. And then, as Your Honor points out, if you take it to the next step, candidly, as a matter of law, there really couldn't be any prejudice because there is no potential for double recovery. Counsel, Counsel Judge Gould, I've got a question, if I may. As I understand it here, the district court addressed several of the pioneer factors, prejudice, length of delay, et cetera, but did not address the factor of good faith, which is one of the four factors. So I wonder, do we have any, do we have any circuit precedent in our circuit adopting the pioneer test? I think we've got Briones. But do we have any that says that it's error if the court does not discuss all four of those factors or any other circuit court in a different circuit, have any ever said that to make this assessment under the pioneer factors, all of the factors have to be considered by the court? Your Honor, I think the short answer to that question is yes. I don't have a citation off the top of my head, but the short answer or the longer answer would be that the court does have a duty to analyze each of the factors. It's possible that in some cases a factor may or may not apply to the specific facts and circumstances, but I believe that the cases that we cite in our brief stand for the proposition that if the court ignores a factor or does not consider a factor in reaching its conclusion, that that is an abuse of discretion. And I would point out in this case that the court's written order certainly does not address the prejudice that's suffered by the plaintiffs in not having the dismissal set aside. And we did cite cases such as Boley and 2,164 watches that stand for the proposition that where a plaintiff will suffer the ultimate prejudice, i.e., cannot refile his or her claim because of the running of the statute of limitations, that is a substantial factor that must be considered by the district court, and that was not done in this case by the district court. The district court focused solely on the alleged prejudice suffered by the government and did not balance that against the prejudice that would be suffered by the appellants by not setting aside the dismissal. Now, do we have any circuit precedent that sets a standard for when the district court must consider the prejudice to the claimants like the Lomoges? I'm sorry, I'm not following that question. Well, the prejudice to the Lomoges of having their suit tossed out, I don't think that's explicit under the pioneer factors. Correct, Your Honor. So do we have circuit precedent that says when it should be considered or should it always be considered? I think the answer to that question, if I'm understanding correctly, Your Honor, is pioneer would apply to Rule 60B cases. In this case, the dismissal resulted under Rule 4 for failure to timely serve the defendant, and so that is when under 2164 watches in Boley that the prejudice to the plaintiff becomes a substantial factor because the courts and the precedents say that essentially Rule 4 is a tool for docket management, not for oppression. And so when the plaintiffs will suffer, again, the ultimate prejudice because their case will be dismissed if the dismissal is not set aside and they won't be able to refile, then, again, that prejudice to the plaintiff factor becomes very important, and that's what those cases do stand for. Okay, thank you. What do you want us to do in this case? Do we send it back to district court to reconsider the equities, or do we say to the district court, if we go your way, you're reversed, and give the plaintiff a reasonable opportunity to make the proper service? What remedy are you saying we should give you? The latter, Your Honor, reversing the order and allowing 30 days for remitted or to serve. Where do you get the 30 days? That was just a reasonable number, Your Honor, that we selected. Well, maybe the district court can figure out the days, but you want us to reverse the court and you don't want another hearing on prejudice. Correct, Your Honor. Okay. And with that, Your Honor, I would just close with we all appreciate the need to keep cases moving. That's why we have Rule 4. But there is a countervailing, if not stronger, public policy in favor of having cases heard on their merits. And I think in this case ---- Let me ask you a question. Sorry to interrupt. And this is probably irrelevant. It is irrelevant, but, you know, we're curious. Does Karuna have malpractice insurance? He's bare as far as I know, Your Honor. What? I believe he is bare. I believe the answer is no. Bare. B-E-A-R? B-A-R-E, Your Honor. Oh, B-A-R-E. Okay. I thought something like that was going on. All right. Well, this is this guy's only chance. Correct, Your Honor. Yeah. And with that, I'll reserve the balance. Okay. Thank you. Good morning. May it please the Court. My name is Melanie Andrews. I'm a Special Assistant U.S. Attorney on loan from the Navy to the Advocate General Corps, and I represent the United States. What do you mean Special Assistant? She's in the Navy. Oh.     Okay. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you, sir. Well, congratulations. Thank you very much. Yeah. And where did you go to law school? Villanova University outside of Philadelphia. Oh, okay. How long have you been with the Jags? Nineteen years. Nineteen years. Well, you're very young. I went to college in Philadelphia at Penn, and in those days, Villanova had a great basketball team. But maybe that's not on point here. That's all right. I am a big fan of the Big Five, sir, so I appreciate that comment. Thank you. I've been to Villanova several times, too. Thank you. I've been to the Jag office in San Diego. They've got a whole list of people there. Yes, sir. I met them in Hawaii, because whenever I go to Hawaii, I get together with the Jag people and remind them that we have the same employer, the people of America. I don't have to remind them, but it sounds good here today. Go ahead. Yes, sir. The issue on appeal is whether or not the district court of visa discretion, when it denied plaintiff's request under Rule 60b-1 to set aside the dismissal of the complaint on the basis of excusable neglect. There's case law within the Ninth Circuit that discusses the time period to be considered with regard to what the court should look at when determining whether or not to set aside a judgment, and typically it's from the point of the judgment forward. However, under the Pioneer and Briona standards, the court is not required or limited to just that period. In this case, at the time of the oral argument, there was quite a bit of discussion about Mr. Caruana's leg infection and the time prior to the dismissal that Judge Burns entered as to whether or not there was good cause. But beyond that, what the court did focus on was the things that happened post-dismissal up until, and that was October 2007, up until May of 2008 when the plaintiffs submitted the 60b motion. The court specifically looked at what happened during that period to determine whether or not excusable neglect occurred. And there were two key things that the court focused on, and he determined that excusable neglect was not present. One was the time delay in the plaintiff's counsel getting back in touch with the court, getting someone else to pick up his caseload. The court, Judge Burns was not satisfied with the delay from the approximately March time frame until May when the brief was filed. And in the interim, there was a related case that the United States was defending against Granite State, and I know that the plaintiff's counsel has mentioned today and in the past in the writings that they do not believe that the United States suffered a prejudice. That's the, you'll pardon my expression. They say we're prejudiced because we settled a subrogation case. I can't see any prejudice. If you made a settlement, a settlement is good for both parties, you got rid of part of the case. I can't see one bit of prejudice there. Maybe you can educate me. In the old days, I did a lot of this kind of work, so I'm way back then. Maybe the times have changed. The Limoge complaint sought an excess of $1 million for recovery on the injuries that Mr. Limoge suffered, and his wife's $100,000 loss consortium claim was part of their complaint. So based on that case alone, the United States was facing over a million dollars of exposure because of the incident at Camp Pendleton. Well, you know what a great defense lawyer told me once? The zeros don't count. I wish that the plaintiffs' counsels, when they submit their complaints to the United States Attorney's Office, would keep that in mind, too, and cut down on the amount of zeros that they seek in their cases. But the point is that, on the other hand, the Granite State case sought a little bit more than $100,000, and in the complaint, they also mentioned in their complaint that the only out-of-pocket cost they had at that point was a little more than $20,000. So two cases combined exposed the United States, and I have to make a side comment on that as well. The injury that occurred to Mr. Limoge occurred at a picnic grounds at Camp Pendleton, and the picnic grounds recreational area is run by the Morale, Welfare and Recreation or the Marine Corps Community Services Division. That is a non-appropriated fund organization within the Department of the Navy, specifically the Marine Corps, which means that if there were any payments from this case based on liability or settlements that were to come from the matter, those funds would come directly from the Marine Corps Recreation's operation funds. Is that in the record? It is not in the record. Well, then what difference does it make anyway? Not in the record. You can't say, well, we relate that as prejudice. That's not in the record. The only thing in the record that I see, and you can correct me, is that the judge, I don't know if you argued this below, did you? No, the lawyer below said, hey, we settled this subrogation case, and we're hurt by it. And the judge says, yes, you're hurt by it, and that's all I could find. Your Honor, for correction, I was the one who was representing the United States below. I didn't understand when you questioned that. Okay, well, that's all right. But I didn't see that you put that in the record and that you did not explain the prejudice, and I still don't see it. I was using that as an aside to explain my thought process to continue to answer the question, which is that by the fact that the Limoge case had been dismissed, and there was no contact from anyone involved, from Mr. Limoge, from his counsel, while the Granite State case was proceeding, we believe that that potential exposure of over a million dollars was not an issue at all in the case. You know, if you checked the clerk's records, you'd seen there was a motion to reopen the day before that settlement was made. Isn't that true? We did not receive notification of that. I know you didn't receive it, but if you had checked the records, you would have found that out. Your Honor. Can I just say something, you see? You know, as servants of the United States, our job is to serve the public. And I've had experience as a trial judge, and 12 years on the district court, and we all worry about our calendars because they're getting out of control, and they have been in San Diego since, oh, probably the turn of the century, last century. And so when you run a busy court like that, and I'm a retired Marine, and my court clerk was a retired captain. He outranked me, but that was all right. We got along. And so he kept track of every case, and we let people know. We let the litigants, through their lawyers, know, okay, you file a case with us. This is not the state court. You just can't sit on your gluteus maximus and think things are going to happen. You've got to get the complaint served within so many days. So we call them up and tell them, because a lot of practitioners don't know that. And then they may say, well, how do we serve? Who do we serve? And we tell them, well, you have to serve the U.S. Attorney's Office, and you can just go down and give it to the Marshal's Office. They'll take it up and serve it. And then if things go along, we don't get any response, and we see that this case is just sort of vegetating, then we send out an order to show cause, why it shouldn't be dismissed for lack of prosecution. Then we'll call the people and let them know. We sent this out. Now you've got to get moving. And we'll offer them some more suggestions. And then you just don't knock off a case just because you sent out an OSC. You've got to try again, and sometimes again more. And I think we have cases that require that. I think this was written by Judge Betty Fletcher. And because we are a service organization, we just can't knock people out of the box. Now, you go on, and you give them all the help in a reasonable period of time, and nothing is still happening, then you just dismiss the case, and then let them come back. But here, apparently we had this lawyer that had all these problems. A phone call over there to his office would have brought that to the attention of the clerk and to the court. And a way could have been found is to let them know how to serve this complaint and what the time limits are. Even our court, if you file an appeal, we give you almost a how-do-you-take-an-appeal kit. We do that. We just give all that information to people. And our clerk's office follows through. But it bothers me that that wasn't done here. And I can understand it, because my guess is probably the judges in San Diego are probably carrying a load of maybe 1,500 cases. Maybe it's 2,000. It's almost humanly impossible to keep up with all of them. But you can't just throw a case out without giving them another chance to come back. Particularly, it's not the client's fault. It's the lawyer's fault. And he seems to have gone through hell and high water, whatever. Sole practitioner. So that's what bothers me here. So are you suggesting that the district court didn't do enough to... Yeah. Yeah, that's what I'm suggesting. I can't speak for the court. Yeah, I know. I've got an article in Fed Sup that I put in there in probably 1971. I don't think he did enough here. But, you know, I can understand what the burdens are. They have a terrible load of narcotics cases. They have a huge load of immigration matters. They've got all of that. So they're short a lot of help down there, too. Here you've got, what was this guy, an Army guy? LaMoges? Retired military. Not sure what branch. Well, I think he was in the Army. But, you know, Navy and the Marines, we've got to be nice to the Army sometimes. And so it's... So he's a veteran, too. If I may respond to that, again, not knowing... And he sustained pretty terrible injuries from what I read here. The leg injuries from the picnic table, that's correct. But fortunately for him as a retiree, he is entitled to military treatment facility benefits. So as far as... I'm a military retiree. Yes, sir. Yeah, and I've been retired since December 31, 1946 with pay. I got an ID card. I like it, too. I'm looking forward to getting mine next year. All right. If I may respond to that, sir, I understand you're concerned about the court maybe not reaching out to Mr. Caruana in light of Mr. Caruana's circumstances. But who better to know about Mr. Caruana's circumstances but him and or potentially his client? And it just would seem to me it would be easier if either Mr. Caruana or a representative or someone on his behalf or the client, after the client perhaps reached out to his attorney to find out what the status of his case was, to find out that nothing was happening, nothing was moving, because the complaint had been filed in April of 2007. Yeah, but clients don't follow all that, you know. They just sit back and the lawyer's got it and everything's going to be fine, and then you've got a lawyer that's got plenty of problems and depression and everything else and health matters and he's on the verge of death and, you know, and you can see what kind of an office he must have been running. He didn't even have malpractice insurance or anything. So he's not ready to call his client and say, well, I goofed up and all that. I mean, he's trying to figure out a way to save himself, but he's gone through a lot of terrible situation himself. Even so, Your Honor, Judge Burns did ask about that during the oral argument and he specifically asked Mr. Caruana when his last surgery occurred, which was November, and Judge Burns took into consideration if your last surgery is in November, you need time to recuperate, to get better. He expected that by March at the latest, which would have been four months after the last surgery, Mr. Caruana should have been able, could have been able, and should have picked up, gotten his practice back in some type of order in order to be able to represent his clients, which he does have a duty to do. And that delay... You know, you're in the Navy over there. The Navy has very competent lawyers. You probably don't have any idea how many bad lawyers there are out there. I mean, we got enough to form a division we could send over to Iraq, you know. There's lots of them. There's lots of them out there. Believe me, you'd be amazed. Only good ones today arguing in this courtroom. That's right. So I have a question for you. Now, if we were to conclude that the district court made an error of law or abused its discretion here by not considering the fourth pioneer factor of good faith and by not considering prejudice to the Lamoge parties, is the remedy what's advocated by the appellant in response to Judge Lay's question, that is for us to say he wins and let him file his complaint, or is the remedy that we should say what the proper legal standard is and why we think the district court made an error and then send it back to the district court to exercise discretion on the proper standard?  And, of course, my position is that Judge Burns did consider all the pioneer BIONA standards. He may not have specifically mentioned them in his opinion, but he did indicate at the beginning of the oral argument that he reviewed all the filings to include the declarations of myself and Mr. Caruana. But if the court disagrees with our position, then we would ask that it be remanded for further proceedings, as opposed to just an automatic determination on this court's part that the dismissal should be set aside. Okay, thank you. I'm sorry. Go ahead, Judge. All right, Judge Lay. I was just going to say thank you. That answered my question on the government's position. Well, the thought comes to me, suppose Judge Burns did the same thing, considered the same thing, we'd have another appeal appear, and I think we'd probably have to say he abused his discretion again. It seems to me it's almost a question of law, that if he abused his discretion, the law would have required him to grant some time to serve the complaint. Your Honor, again, I think that more development of facts, as you pointed out to me just now, that there were some things about prejudice that neither did I. I did not go into detail in my filings, nor did he ask at the hearing, but there is more information that could develop the record further. I'd like to further explain to you why the government believes there was prejudice in the case. And again, the bottom line is that when we settled the case with Grant Estate, we were of the belief that the issue, the incident from April 17, 2004, that resulted in Mr. Lemos's injury was forever resolved because his case had been dismissed for lack of failure to prosecute, for basically, as I described, the sitting on the sidelines. His case was gone in our mind, and we wanted to resolve the Grant Estate issue, and we did by settlement. Had both cases been active, had the motion... I understand your position. We would not have settled the Grant Estate case. You're telling me that you could convince me to the contrary if you had a chance. You didn't have to do that. Oh, okay. Sorry. Okay. I understand your position. And we've never conceded liability, and we still do not. I understand. Yeah, yeah, yeah. Yes, it's a strange accident. But, well, we'll think about it. Glad you're here. Now, we have some young lawyers here, women lawyers. I've tried to encourage many of them to go into the Navy JAG. They've only been successful once. So if you'd like a few minutes, you can get them all in a group, and you can talk to them. This is a relevant question, but I was thinking back. Does the name Steve Harvey, who went ring-a-bell with you at all, graduate of Villanova about the same time as you did? No, sir, it doesn't. I'm sorry. Okay. That's fine. Well, appreciate your service. That's what they say these days. Thank you, sir, and likewise to you. Thank you. Thank you, gentlemen. Thank you. I'm a WW2 guy. The good war. Yes, sir. Yeah. Me too. Me too, yeah. The good war. That's when everybody participated, not just the sons and daughters of the poor and others from little towns. You look like you're in good shape. Maybe you ought to sign up. You know, my father would. He tried to get me to do that back in the day because he served in the Navy. Yeah, well, younger generation. You've got to. It's all right. It's a different world we live in today. I understand. And we don't have as much confidence in the past leadership that we used to have. My concluding thought, Your Honors, would be that with respect to how the court, assuming that the matter gets sent back on a finding of error or abuse of discretion, how it should be handled, I would respectfully submit, as Judge Bright pointed out, that if we just sent it back for further review, we might end up back here again, because I don't believe that under any circumstances. Well, we understand all that, yeah. We understand all that. Okay, well, we'll wait and see what happens. Thank you very much. Thank you. I've got to take a recess. Yeah, we're taking a recess now. Okay. Yeah, we'll be back. All rise. Court stands in recess. Let's find our way out of here. There it is. There it is. There it is. Reminds me of the Supreme Court. Thank you, sir. Okay.
judges: Bright, Pregerson, Gould